United States District Court
Southern District of Texas

**ENTERED**

September 25, 2023

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| **LARRY DEAN LUNA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 6:21-CV-00017** |
| | § | |
| **VERONICA GRANADOS, RHONDA** | § | |
| **ULLMAN, KATRINA LAWSON,** | § | |
| **ROBIN DELEON, GAYLE** | § | |
| **BRUMBELOW, MADISON MACHAC,** | § | |
| **KOURTNE ROBERTS, ASHLEY BLACK,** | § | |
| **and VICTORIA COUNTY, TEXAS,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Larry Dean Luna alleges that he was denied adequate medical and dental care while confined in the Victoria County Jail and has filed an Amended Complaint alleging that his civil rights were violated as a result. He. (Dkt. No. 14). He proceeds pro se and in forma pauperis. (Dkt. No. 12). After Luna provided additional details at a *Spears* hearing,[1] Magistrate Judge Jason B. Libby issued a Memorandum and Recommendation ("M&R") that recommended retaining claims against several defendants and dismissing all other claims under the screening criteria for complaints governed by the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915A, and 28 U.S.C.

---

[1] A *Spears* hearing, which the Fifth Circuit authorized in *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), is an "evidentiary hearing in the nature of a Fed. R. Civ. P. 12(e) motion for more definite statement." *Eason v. Holt*, 73 F.3d 600, 602 (5th Cir. 1996). Its purpose is "to flesh out the allegations of a prisoner's complaint to determine whether in forma pauperis status is warranted or whether the complaint, lacking an arguable basis in law or fact, should be dismissed summarily as malicious or frivolous." *Ibid.*

§ 1915(e)(2)(B).  (Dkt. No. 49).  The undersigned accepted the M&R on November 2, 2021.  (Dkt. No. 57).

Defendants Victoria County, Veronica Granados, Katrina Lawson, Robin DeLeon, Gayle Brumbelow, Madison Machac, Kourtne Roberts, and Ashley Black have now filed a Motion for Summary Judgment, arguing that Luna has not demonstrated that he was denied constitutionally adequate care and that the individual Defendants are entitled to qualified immunity.  (Dkt. No. 94).  Luna has filed a Response, which raises claims against Rhonda Ullman, who was formerly identified by him as Rhonda Williams.  (Dkt. No. 98).  For the reasons discussed below, the Court **GRANTS** the Defendants' Motion for Summary Judgment, (Dkt. No. 94) and **DISMISSES** this case.

## I.    BACKGROUND

### A.    THE PARTIES

Luna is presently serving a sentence of imprisonment in the Texas Department of Criminal Justice ("TDCJ") as the result of a conviction from Victoria County.  (Dkt. No. 33 at 5, 43).[2]  This case concerns the conditions of Luna's confinement in the Victoria County Jail (the "Jail"), where he was in custody most recently from November 12, 2020, through June 17, 2021, when he was transferred to TDCJ following his conviction on June 3, 2021.  (Dkt. No. 33 at 43, 71); (Dkt. No. 94-4 at 1).

Luna's initial pleading, which is dated April 14, 2021, consisted of a hand-written letter seeking leave to proceed with a lawsuit in forma pauperis against the Jail, the

---

[2]    For purposes of identification, all page numbers refer to the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

Victoria County Sheriff's Office, and the Jail Medical Department. (Dkt. No. 1). On April 27, 2021, Luna filed an Amended Complaint against the Jail and several medical providers who treated him while he was at that facility. (Dkt. No. 14 at 10). Veronica Granados was a Nurse Practitioner who provided medical care to inmates at the Jail clinic through her employment with the medical group Victoria Hospitalist Associates, LLC. (Dkt. No. 94-4 at 2). Dr. Kourtne Roberts was a psychiatrist who provided services to inmates at the Jail through Crossroads Psychiatry. (*Id.*). Katrina Lawson, Robin DeLeon, Gayle Brumbelow, Madison Machac, and Ashley Black were nurses employed at the Jail. (*Id.*). Victoria County, which was substituted in place of the Jail, is also a Defendant. (Dkt. No. 50).

### B.   LUNA'S ALLEGATIONS

Luna's primary allegation is that he was "refused quality treatment" at the Jail for a medical condition known as priapism. (Dkt. No. 14 at 4–8). The Defendants have provided an affidavit from one of the urologists who treated Luna for priapism, Dr. Aaron New, who offers the following description of this condition and the types of treatment available:

> Priapism is a medical issue where blood becomes trapped in the penis and causes long and painful erections. It has many causes including the use of certain medications and illicit drugs. Priapism is commonly treated with medication to restrict blood flow to the penis, such as Sudafed or, in more extreme cases, direct injections of phenylephrine into the penis or arm. We can also drain the blood from the penis through a procedure called aspiration. If these procedures are ineffective in curbing the recurrence of priapism erections, we generally recommend that a patient consider penile shunt surgery.

3

(Dkt. No. 94-5 at 1). Dr. New explains that there are various types of shunt surgeries, which can prevent a recurrence of priapism when injections and aspiration treatments fail to work. (*Id*. at 2). Possible risks associated with penile shunt surgery include impotency and gangrene. (*Id*.).

Luna alleged that has he lost all function in his penis as a result of the Defendants' refusal to send him to a urologist when he experienced priapism erections while at the Jail. (Dkt. No. 14 at 9). Luna alleged further that he was denied care by a dentist for a broken tooth that he sustained while in custody at the Jail. (*Id*.). He provided few details, however, repeating the same claim against a list of 20 defendants who reportedly denied him "quality" medical care by a specialist. (*Id*. at 4-8).

For purposes of screening the pleadings under the PLRA, 28 U.S.C. § 1915A, and 28 U.S.C. § 1915(e)(2)(B), which applies in all cases filed by an indigent litigant, Judge Libby held a *Spears* hearing on June 8, 2021, giving Luna an opportunity to provide additional details in support of his claims under oath.[3] (Dkt. No. 33). Luna explains that he developed priapism after he was diagnosed with "myeloid leukemia cancer" by doctors at the University of Texas Medical Branch ("UTMB") John Sealey Hospital in 2006, while he was imprisoned in TDCJ. (*Id*. at 27–28). Luna was released from prison in 2007, without receiving any treatment for cancer or priapism. (*Id*. at 28).

While out of custody Luna received treatment for priapism from a local Victoria urologist named Dr. White, who prescribed Sudafed as a blood-thinner medication to

---

[3]     *See, supra,* note 1.

prevent prolonged erections. (*Id*. at 28, 29). Luna explains that priapism erections that do not resolve on their own require treatment from a urologist, who can administer a shot or drain blood from the penis to release pressure. (*Id*. at 31–32). Without intervention from a urologist, Luna claims that an erection lasting over four hours can result in permanent damage that would require an operation to prevent death by blood poisoning. (*Id*.).

Luna estimates that he was incarcerated around 15 times between 2006 and 2020, and that he stayed at the Jail in Victoria County on approximately 30 occasions during this period. (Dkt. No. 94-1 at 7). When he was not in custody Luna was able to control his priapism with Sudafed that he purchased over the counter at the local grocery store or Walmart. (*Id*. at 4). Luna asserts that he required at least nine trips to the local emergency room between January and August 2020, when he was reportedly released from the Jail on a personal-recognizance bond. (Dkt. No. 33 at 34–35).

While out on bond Luna had a series of priapism erections. In early October 2020, Luna sought treatment for one of those erections at the Citizens Medical Center Emergency Room ("CMC-ER") in Victoria, which sent him by ambulance to have blood drained from his penis by a urologist in Houston. (*Id*. at 37). Shortly thereafter, Luna went to DeTar Hospital in Victoria, which sent him by ambulance to a urologist in San Antonio, who performed the same procedure. (*Id*. at 38). After the procedure, the urologist in San Antonio recommended that Luna have an operation, but Luna refused. (*Id*.). After experiencing another painful erection days later, Luna went to a hospital in Houston, where a urologist drained blood from his penis in the emergency room. (*Id*. at

39).  This urologist reportedly told Luna that his penis was permanently damaged from having "long erections without immediate urologist aid."  (*Id*. at 40).  The urologist gave Luna a choice:  have an operation to permanently stop his erections or die of blood poisoning.  (*Id*.).  Luna had the operation in Houston in early October 2020, and now claims that he has lost all normal function in his penis because he can no longer self-stimulate to achieve an erection.  (Dkt. No. 14 at 9); (Dkt. No. 94-1 at 18).  He also has lingering numbness and discomfort in his penis.  (Dkt. No. 94-1 at 18).

Complications with the sutures from his surgery caused Luna to miss a court date for some misdemeanor charges that were pending against him in Victoria County on October 14, 2020, and he was subsequently arrested on new felony drug charges on November 12, 2020.  (Dkt. No. 33 at 44).  When he returned to the Jail on that date, Luna alleges that "provider Veronica" (Granados) refused him care for the surgical wound on his penis, which then became infected.  (*Id*. at 45).  He claims that his penis is now deformed because the scar did not heal correctly.  (*Id*. at 46).  In addition, despite having surgery Luna alleges that he continued having priapism erections at the Jail during the early 2021, but that he was not sent to a urologist until the end of March 2021.  (*Id*. at 49).  Luna blames all of the Defendants and Nurse Rhonda Williams for not sending him to a urologist sooner.  (*Id*. at 55–57, 61–62, 69).

Luna also alleges that he was denied adequate dental care for a damaged tooth that he sustained at the Jail in December 2020.  (Dkt. No. 14 at 9).  Luna explains that he bit into a piece of wire that was in his mashed potatoes due to the negligence of kitchen staff.  (Dkt. No. 33 at 13).  A detention officer pulled the wire from Luna's mouth, breaking

6

part of his tooth. (*Id.*). A nurse named "Ms. Madison" (Machac) gave him some aspirin and told him that he would be placed on the dentist list. (*Id.* at 15). When Luna told her that he had swallowed some of the metal, she advised him that she would recommend x-rays. (*Id.*). X-rays taken days later at a local hospital showed that Luna had ingested some metal. (*Id.* at 17). The wire was described as thin, like a "bread tie." (*Id.* at 18). Luna, who has Hepatitis-C and cirrhosis of the liver, eventually began throwing up blood. (*Id.* at 22). Luna saw a gastroenterologist in March 2021, but he did not see a dentist until April 2021. (*Id.* at 22–23). Luna seeks monetary damages for his medical bills as well as compensation for his pain and suffering. (*Id.* at 57).

## C.   THE SUMMARY JUDGMENT MOTION AND EVIDENCE

The Defendants move for summary judgment on Luna's claim that he was denied adequate medical or dental care, asserting that he fails to establish a constitutional violation. (Dkt. No. 94 at 11–12). Arguing further that Luna fails to demonstrate a violation of clearly established law, the individual Defendants assert that they are entitled to qualified immunity from his claims. (*Id.* at 12). In support, the Defendants present excerpts of Luna's deposition testimony and portions of the *Spears* hearing transcript. (Dkt. No. 94-1); (Dkt. No. 94-2). The Defendants present affidavits from Dr. John McNeill, an internal-medicine specialist who serves as an attending physician at the Jail, Nurse Supervisor Rhonda Ullman ("Nurse Ullman"), Dr. New, and Dr. Dharmendra Verma, who is a gastroenterologist. (Dkt. No. 94-3); (Dkt. No. 94-4); (Dkt. No. 94-5); (Dkt. No. 94-6). The Defendants also present selected medical records of treatment that Luna received

while at the Jail from November 12, 2020, through June 17, 2021.  (Dkt. No. 94-7).  The Defendants' evidence is summarized below.

Nurse Ullman explains that she reviews all requests for medical care by inmates at the Jail and responds to those requests based on the severity of the symptoms or the urgency of the request.  (Dkt. No. 94-4 at 1).  Inmates may receive a written response to their request or be assessed in the Jail clinic by nursing staff or Dr. McNeill.  (*Id*.); (Dkt. No. 94-3 at 1).  One of Dr. McNeill's primary responsibilities is to directly assess inmates and recommend further treatment.  (Dkt. No. 94-3 at 1); (Dkt. No. 94-4 at 1).  Dr. McNeill may refer an inmate to the CMC-ER or to specialists for appointments regarding more severe or complex medical issues.  (Dkt. No. 94-3 at 1).  Either Dr. McNeill or another treating physician at the CMC-ER can refer an inmate to a specialist.  (Dkt. No. 94-4 at 1).

Dr. McNeill explains that the process for an inmate to see a specialist is the same as for citizens in the free world by requesting an appointment with the provider, getting on a list, and waiting on that list for an appointment subject to the specialist's current bookings and the severity of need.  (Dkt. No. 94-3 at 1).  Urgent matters are referred immediately to the CMC-ER, where inmates can also be referred to a specialist.  (*Id*.).  Dr. McNeill, who also serves as the Victoria County Health Authority through the Victoria Public Health Department, is not at the Jail full-time.  (*Id*.).  He is, however, there on a weekly basis and is always available remotely to confer with Jail medical staff, recommend treatment, and prescribe medication.  (*Id*.).  The Jail employs nurses who are authorized to address requests, administer prescribed medication, and refer inmates for

urgent care.  (Dkt. No. 94-4 at 1).  The nurses are full-time employees, but they do not provide care 24 hours per day and are not present on weekends.  (*Id.*).

The Defendants note that there are no medical records showing that Luna was ever diagnosed with leukemia, and tests performed at the Jail disclosed no evidence of cancer. (Dkt. No. 94 at 2); (Dkt. No. 94-3 at 2).  Dr. McNeill saw Luna for complaints of an acute, painful erection while he was in custody at the Jail on February 14, 2018.  (Dkt. 94-3 at 1). Dr. McNeill prescribed Sudafed to treat his priapism and provided a referral to the CMC-ER.  (*Id.*).  Dr. McNeill referred Luna to the CMC-ER again for complaints of an erection lasting more than four hours on July 31, 2019.  (*Id.*).

According to Dr. McNeill, Luna asked to see a urologist on November 5, 2019, due to another prolonged erection.[4]  (*Id.* at 2).  Dr. John White, who served as Luna's previous urologist, advised Dr. McNeill that he had recommended a surgical procedure to mitigate the recurrence of Luna's priapism.  (*Id.*).  Luna, who was 49 years of age at the time this case was filed, testified during his deposition that he refused to have the surgery because he was still young and feared becoming impotent.  (Dkt. No. 94-1 at 10–11).

The Defendants report that Luna was released on bond on November 21, 2019, and he did not return to the Jail until a year later on November 12, 2020. (Dkt. 94 at 3). Therefore, the Defendants argue that Luna's claim that he was denied medical care at the Jail between January and August 2020 is unsupported.  (*Id.*).

---

[4]    The Defendants have not provided medical records of the care provided to Luna at the CMC-ER or by any of the specialists who treated him during October 2020.

According to Dr. McNeill, Luna went to the CMC-ER while he was out of custody on October 2, 2020, complaining about priapism. (Dkt. No. 94-3 at 2). Luna reported having a history of methamphetamine and cocaine use, which can cause priapism. (*Id*.); (Dkt. No. 94-5 at 1). He also reported having cancer, but provided no documentation or information about the physician who diagnosed this condition, and his lab results were normal. (Dkt. No. 94-3 at 2). Shortly thereafter, Luna was treated by a urologist in San Antonio named Dr. Robert Norman. (*Id*.). Luna reportedly refused surgical intervention that Dr. Norman recommended as treatment for his priapism, which had required "repeat aspiration or draining of the penis and intracorporeal PE injections." (*Id*.).

On October 6, 2020, Luna had penile shunt surgery at Memorial Hermann Hospital in Houston. (Dkt. No. 94-3 at 3); (Dkt. No. 94-7 at 47). A urologist named Dr. Hajar Ayoub performed the procedure, (*id*. at 2–3), which Dr. New describes as "creating a connection, or 'shunt,' between the cavernosa and the glands of the penis." (Dkt. No. 94-5 at 2). Dr. New states that pain and swelling are common after this procedure, which requires making an incision into the head of the penis. (*Id*.).

A week after the procedure, on October 14, 2020, Luna reported to the CMC-ER, complaining of penile pain, but left before seeing anyone. (*Id*. at 2). Luna returned to the CMC-ER on October 19, 2020, and was prescribed Clindamycin, Bactrim, and Tylenol with Codeine for his complaints of pain from the surgical procedure performed by Dr. Ayoub. (*Id*.). Dr. McNeill notes that Luna did not fill the prescriptions or follow up with Dr. New as instructed during that visit. (*Id*.). On October 25, 2020, Luna again sought

wound care for the penile incision at the CMC-ER. (*Id*.). According to Dr. McNeill, Luna's penis was observed to be healing with no sign of infection. (*Id*.).

Medical records show that, following Luna's arrest on drug charges on November 12, 2020, he was evaluated at the CMC-ER, where he tested positive for methamphetamine. (Dkt. No. 94-3 at 2); (Dkt. No. 94-7 at 6). He was cleared for booking into the Jail with outpatient care for chronic substance abuse and priapism. (Dkt. No. 94-7 at 5). The provider who examined Luna noted a "[s]ingle small superficial incision" on his penis, but there was no indication of infection. (*Id*. at 4). He was discharged in "good" condition with instructions to keep the wound area clean and dry. (*Id*. at 5). According to Nurse Ullman, Luna was prescribed several medications upon his return to the Jail, including Buproprion, Diuaproex, Hibiclens, antibiotic cream for the incision on his penis, and Sudafed for his priapism. (Dkt. No. 94-4 at 2).

On November 13, 2020, Luna complained of penile pain and requested a wound check on his incision. (Dkt. No. 94-4 at 2). Luna was sent back to the CMC-ER, where records show that he had a testicular ultrasound in consultation with Dr. New. (Dkt. No. 94-7 at 7); (Dkt. No. 94-5 at 2). The ultrasound showed that his testicles were normal in appearance with normal vascular flow. (Dkt. No. 94-7 at 7). Other than some "mild diffuse soft tissue swelling" at the base of the penis, which is common following shunt surgery, Dr. New concluded that Luna's penis was healing properly and that there were no signs of infection. (Dkt. No. 94-5 at 2). Dr. New prescribed Sudafed to prevent further recurrence of priapism and Acetaminophen for pain management. (*Id*.).

11

Luna submitted a sick call request at the Jail on November 15, 2020, seeking urgent care for pain in his genital area and penis. (Dkt. No. 94-7 at 9). Nurse Brumbelow observed that he had bloody drainage at the tip of his penis, where his surgical incision was located. (*Id.*). After Luna told her that he had been having erections "off and on all day," she contacted Dr. McNeill. (*Id.*). Dr. McNeill referred Luna to the CMC-ER. (Dkt. No. 94-3 at 2). Medical records show that Luna had laboratory tests and was given information about proper hygiene. (Dkt. No. 94-7 at 10). Luna's penis was observed to be clean and dry with no sign of infection. (Dkt. No. 94-3 at 2). He was discharged to return to Jail with a prescription for Tramadol as needed for acute pain and instructions to follow up with a urologist. (Dkt. No. 94-7 at 10).

On November 23, 2020, Luna was seen in the Jail clinic for urinalysis that was requested by a provider after he complained of painful urination. (Dkt. No. 94-4 at 2); (Dkt. No. 94-7 at 12). The nurse who saw him that day noted no other issues. (*Id.*). According to Nurse Ullman, the incision on his penis remained dry and clean. (Dkt. No. 94-4 at 2).

On December 13, 2020, Luna complained of pain in his penis and prolonged erections. (Dkt. No. 94-4 at 2). Nurse Ullman contacted the urologist who saw Luna in San Antonio, Dr. Norman, who provided the Jail with medical records of his treatment. (*Id.*). Luna was given a generic form of Sudafed (SudaGest) and he was also prescribed a hydrating cream for his penis. (*Id.*).

On December 19, 2020, Luna complained that he was not receiving adequate wound care for his surgical incision and asked to see a urologist. (Dkt. No. 94-4 at 3). Jail

12

medical staff again contacted Dr. Norman in San Antonio and confirmed that Luna had refused further treatment interventions or operative care, but had been discharged in stable condition without the need for further intervention.  (*Id*.).  Nurse Ullman explains that the Jail did not have any records of the operation performed by Dr. Ayoub in Houston.  (*Id*.).

On December 21, 2020, Luna complained of a broken tooth that occurred on December 18, 2020, when a Jail detention officer pulled a piece of wire out of Luna's mouth.  (Dkt. No. 94-4 at 3).  According to Nurse Ullman, the piece of metal was contraband that Luna was attempting to conceal in his mouth from Officer Eddie Flores. (*Id*.).  Nursing staff observed no redness or swelling around Luna's tooth.  (Dkt. No. 94-3 at 3).  Nurse Machac gave Luna pain medication and placed him on the waiting list to see a dentist.  (Dkt. No. 94-4 at 3)   Luna was also given more psychiatric medication.  (*Id*.). Although Luna complained about the wound on his penis, the incision was observed to be dry and healed.  (*Id*.)

On December 24, 2020, Luna submitted a sick call request for x-rays of his tooth and stomach.  (Dkt. No. 94-7 at 13).  A staff member responded by advising Luna that he was already on the dentist list.  (*Id*.).  Medical records reflect that Luna had an x-ray of his abdominal cavity at the Jail several days later on December 29, 2020, which revealed foreign bodies that looked like "hairpins or possibly paperclips" in his abdomen.  (Dkt. No. 94-7 at 14).  X-rays taken the following day at the CMC-ER confirmed a "U shaped thin linear metallic" object in his colon, near the rectum.  (*Id*. at 15, 17).  The physician

who treated Luna explained that no treatment was required because the swallowed object was expected to pass in stool with no problems.  (*Id*. at 17).

Luna returned to the CMC-ER on December 31, 2020, due to an onset of priapism and an erection lasting six hours.  (Dkt. No. 94-7 at 19, 22).  Jail personnel gave him Sudafed, but it did not help.  (*Id*.).  Luna was treated with an injection of Terbutaline in his left upper arm and monitored until his condition improved.  (*Id*. at 20–21).  He was discharged with a referral for follow-up treatment by a urologist.  (*Id*. at 21, 23).

On January 7, 2021, Luna submitted a sick call request to see a doctor about his psychiatric medication.  (Dkt. No. 94-7 at 24).  He also stated that he did not need Sudafed and wanted what the urologist prescribed.  (*Id*.).  Jail clinic personnel replied that the urologist prescribed Sudafed.  (*Id*.).  Later that day Luna submitted a second sick call request about painful urination.  (*Id*. at 25).  Infirmary personnel replied that Luna's medical provider was aware of the issue, stating that he needed to continue taking his medication and that it was not helpful to refuse.  (*Id*.).

Luna submitted a sick call request to see a urologist on February 7, 2021.  (Dkt. No. 94-7 at 27).  Nurse Ullman replied that a urologist had been consulted and that they were awaiting appointment details.  (*Id*.).  Progress notes reflect that Nurse Ullman contacted Dr. New's office on February 9, 2021, to report that Luna was complaining of longer, more frequent, and more painful erections that had not been witnessed by Jail staff.  (*Id*. at 28).  One of Dr. New's staff told Nurse Ullman that Luna's issue was considered "a routine follow up" and that Luna would be seen when an appointment was available.  (*Id*.).  The

14

staff member stated that she would check with Dr. New to see if a sooner appointment would be available. (*Id*.).

Progress notes reflect that Nurse Ullman spoke with Luna on February 11, 2021, and addressed his claim that he had leukemia. (Dkt. No. 94-7 at 26). She noted that records from UTMB indicated that he did not have leukemia. (*Id*.). Luna was also told that Jail medical personnel had contacted Dr. New multiple times and were waiting for his office to schedule an appointment. (*Id*.). Nurse Ullman spoke to nursing staff at the Jail about Luna's priapism and was told that he had reported having erections, but when they went to check on Luna, he did not have one. (*Id*.).

On February 13, 2021, Luna was seen in the CMC-ER for complaints of nausea and vomiting. (Dkt. No. 94-7 at 29). Some abdominal tenderness was noted, but his physical examination and blood work were normal. (*Id*. at 30–31). He was discharged back to the Jail in stable condition. (*Id*. at 31).

Luna returned to the CMC-ER for complaints of priapism on February 18, 2021. (Dkt. No. 94-7 at 32). He was treated with Toradol, Terbutaline, and subcutaneous injections of Phenylephrine into each corpus cavernosum in his penis. (*Id*. at 33–34). He was discharged with instructions to follow up with a urologist. (*Id*. at 33).

On March 10, 2021, Luna was evaluated by gastroenterologist Dr. Darmendra Verma after he was seen at the CMC-ER for vomiting blood. (Dkt. No. 94-7 at 35). Luna reported that he accidentally swallowed a piece of wire and that he now had a metallic taste in his mouth. (*Id*.). Dr. Verma, who is affiliated with a number of hospitals and has an outpatient clinical practice in Victoria, reviewed Luna's records and observed that he

had swallowed a foreign object at the Jail in December 2020, and that he had received x-rays and lab work.  (Dkt. No. 94-6 at 1).  Dr. Verma determined that the foreign object was not the cause of his gastrointestinal issues because it had almost certainly passed through his stool.  (*Id.*).  Dr. Verma noted that Luna was diagnosed with Hepatitis-C in 2006 but had not received any treatment for the condition.  (*Id.*).  According to Dr. Verma, Luna reported no symptoms or discomfort of any kind on the day of the examination, including heartburn/reflux, nausea or vomiting, constipation, abdominal pain, or black or bloody stool.  (*Id.* at 2).  Dr. Verma reviewed the list of Luna's medications and the results of his lab work, all of which was normal, and determined that Luna was suffering a minor gastrointestinal issue unrelated to the foreign object that he swallowed.  (*Id.*).  In addition, Dr. Verma concluded that it was not necessary to conduct additional testing such as an esophagogastroduodenoscopy (an "EGD") or a colonoscopy, but advised Luna to follow up in six weeks if the symptoms persisted.  (*Id.*).

On March 18, 2021, Luna saw Dr. New at the Citizens Urology Clinic to address his reports of having recurrent erections lasting as long as eight hours.  (Dkt. No. 94-7 at 38).  Dr. New noted that Luna did not have an erection that day and that there was no current evidence of priapism, but there was swelling, plaque, and scarring on Luna's penis from having undergone numerous interventions.  (*Id.* at 40).  Dr. New also noted evidence of a well-healed incision from the shunt surgery performed by Dr. Ayoub in Houston.  (*Id.*).  There was no sign of infection.  (Dkt. No. 94-5 at 2).  Dr. New concluded that he would need to obtain Luna's medical records from his previous surgery to tailor a plan of treatment.  (Dkt. No. 94-5 at 2).

On April 15, 2021, Luna complained about blood in his urine, painful urination, and pain in his scrotum. (Dkt. No. 94-4 at 3). He also requested an update on Dr. New's treatment prognosis. (*Id.*). A urine test conducted at the Jail showed no sign of infection. (*Id.*). Progress notes reflect that a Jail infirmary staff member contacted Dr. New's office on April 20, 2021, to see if he had received Luna's records yet. (Dkt. No. 94-7 at 42). A nurse from Dr. New's office called back the following day and indicated that Dr. New had reviewed the records from Luna's urologist in Houston. (*Id.*). When he was advised about Luna's complaints of blood in his urine, Dr. New concluded that it was unnecessary to bring him to the CMC-ER because urinalysis conducted at the Jail did not show any signs of infection. (Dkt. No. 94-5 at 2).

On April 26, 2021, Luna submitted a sick call request asking to have his damaged tooth pulled, noting that he had been on the list to see a dentist since December 18. (Dkt. No. 94-7 at 43). Nurse Machac replied that Luna was still on the dental list and would be seen as soon as possible. (*Id.*). Although it had been several months, Nurse Ullman explains that this was the average wait for inmates to see a dentist for a general examination. (Dkt. No. 94-4 at 4). She also noted that it was the first time that Luna complained about his tooth since he reported the problem in December 2020. (*Id.*).

Luna submitted an inmate request on April 26, 2021, asking for the results of a urine test that was done on April 20, 2021. (Dkt. No. 94-7 at 44). Luna wanted to know if the test results disclosed bacteria in his urine and asked to see a urologist. (*Id.*). Nurse Machac replied the following day that Luna's urine tests showed no infection and

advised him that they were still waiting for the urologist (Dr. New) to send over his recommendation for treatment.  (*Id*.).

On April 27 and April 29, 2021, Luna complained about a mass in his abdomen. (Dkt. No. 94-4 at 4).  Providers at the Jail diagnosed the mass as a hernia on April 30, 2021, and advised Luna to contact the infirmary again if it became larger or more painful.  (*Id*.). Luna returned to the Jail clinic on May 1, 2021, where he reported having blood in his stool that had stained his "thermal bottoms."  (Dkt. No. 94-7 at 45).  Noting that Luna had been seen by a provider on April 30, 2021, and that he did not seem to be in distress, the nurse provided him with two diapers and a biohazard bag.  (*Id*.).  Stool samples were taken from Luna on May 3, 2021, which were "negative for blood."  (*Id*. at 45–46).

On May 5, 2021, Dr. New submitted his written recommendation following Luna's office visit on March 18, 2021.  (Dkt. No. 94-7 at 47).  In that recommendation, which was received at the Jail on May 6, 2021, Dr. New noted that Luna had undergone numerous irrigations, intracavernosal therapy, and had "failed both a Winter's and distal al-Goral shunt [procedure]" performed by Dr. Ayoub.  (*Id*.).  Dr. New concluded that Luna may need "a more proximal shunt," but that he was not experienced with this type of procedure or comfortable performing one.  (*Id*.).  Dr. New recommended a referral for Luna "to see a male erectile specialist" in Houston.  (*Id*.).  Dr. New explains that he was the only urologist employed at the CMC at the time, so Luna would not have had the option to seek this procedure from someone else locally while he was in custody at the Jail.  (Dkt. No. 94-5 at 2).

Nurse Ullman reports that Luna was able to see a dentist on May 8, 2021, for his complaints regarding the metal bread tie.  (Dkt. No. 94-4 at 4).  On May 28, 2021, Luna requested a mental health interview.  (*Id.*).  According to Nurse Ullman, Luna was seen by Dr. Roberts at Crossroads Psychiatry, who advised that there was no need to adjust his medication.  (*Id.*).

On June 1, 2021, Luna complained of painful and smelly urination and abdominal pain.  (Dkt. No. 94-4 at 4).  Nurse Ullman reports that Luna was seen in the clinic that day and that his penis was not infected.  (*Id.*).  On June 17, 2021, Luna was transferred to state prison.  (*Id.*).

## II.   LEGAL STANDARDS

### A.   SUMMARY JUDGMENT

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  "In making that determination, a court must view the evidence in the light most favorable to the opposing party."  *Tolan v. Cotton*, 572 U.S.

650, 657, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam) (internal quotations omitted).

If the movant demonstrates the absence of a genuine issue of material fact, the burden ordinarily shifts to the nonmovant to provide "specific facts showing the existence of a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis omitted).  Because Luna represents himself, his pleadings are entitled to a liberal construction and are subject to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam).  Even under this lenient standard, pro se litigants are expected to "properly plead sufficient facts that, when liberally construed, state a plausible claim to relief, serve defendants, obey discovery orders, present summary judgment evidence, file a notice of appeal, and brief arguments on appeal." *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) (footnotes and citations omitted).  Courts are not required "to scour the record in search of evidence to defeat a motion for summary judgment; [courts] rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies." *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 555 n.7 (5th Cir. 2016) (internal quotations omitted).

### B.   QUALIFIED IMMUNITY

The individual defendants have invoked the defense of qualified immunity, which protects government officials from personal liability for monetary damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  Qualified immunity, which is designed to give public servants "breathing room to make reasonable but mistaken judgments," protects "all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct. 1235, 1244, 182 L.Ed.2d 47 (2012) (internal quotations omitted).  Qualified immunity shields public officials from claims for monetary damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738).  Courts have discretion to decide the order in which to consider the two-prong inquiry when determining whether qualified immunity is warranted.  *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

Importantly, "a good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Ratliff v. Aransas County, Tex.*, 948 F.3d 281, 287 (5th Cir. 2020) (cleaned up).  Once the defense is invoked by a defendant, "the plaintiff must rebut it by establishing (1) that the [defendant] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.' " *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (citation omitted)).  "At the summary-judgment stage, [a plaintiff] may not rest on mere allegations or unsubstantiated

assertions but must point to specific evidence in the record demonstrating a material fact issue concerning each element of his claim." *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018).

## III.   DISCUSSION

### A.   CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

Luna contends that the individual defendants violated his constitutional rights by failing to provide him with adequate medical or dental care from specialists.  (Dkt. No. 14 at 4–9).  Luna's claim that he was denied adequate medical care while he was in custody at the Jail as a pretrial detainee implicates both the Fourteenth and Eighth Amendments, which have the same legal standard in this context.  *See Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).  "[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference."  *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021). The Eighth Amendment, which protects inmates under a sentence of imprisonment, also prohibits deliberate indifference to the serious medical needs of prisoners.  *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

"Deliberate indifference is an extremely high standard to meet."  *Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 305 (5th Cir. 2020).  Deliberate indifference requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).  Thus, a prisoner must present

proof or point to "evidence of (1) an objective exposure to a substantial risk of harm and (2) deliberate indifference of a prison official where (A) the official had subjective knowledge that the inmate faced a substantial risk of harm and (B) disregarded the risk." *Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021).

"Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exigent circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Deliberate indifference requires a prisoner to demonstrate that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (internal quotation marks and citation omitted). Allegations of delay in receiving medical care violate the Constitution only "if there has been deliberate indifference that *results in substantial harm*." *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) (emphasis in original).

Most of Luna's allegations against the defendants are conclusory and general in nature, grouping claims against all of the defendants without specific dates or details about each individual's personal involvement. (Dkt. No. 14 at 9); (Dkt. No. 33 at 55–69). While Luna's generalized allegations may have been sufficient to survive the low bar for screening a prisoner's complaint under 28 U.S.C. § 1915A or 28 U.S.C. § 1915(e)(2)(B), survival beyond the screening stage requires something more. *See, e.g., Ashcroft v. Iqbal*,

556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient to survive a motion to dismiss.); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) ("the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial") (citing *Celotex*, 477 U.S. at 325, 106 S.Ct at 2553–54).   Personal involvement is an essential element of a civil rights claim against a government official in his or her individual capacity.   *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a [42 U.S.C. § 1983] cause of action.").   The plaintiff "must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation."   *Jones v. Lowndes Cnty., Miss.*, 678 F.3d 344, 349 (5th Cir. 2012).   A plaintiff's conclusory allegations and generalized assertions are not sufficient to state a claim in a case governed by Section 1983; particular facts are required to specify the personal involvement of each defendant.   *See Murphy v. Kellar*, 950 F.2d 290, 292 & n.7 (5th Cir. 1992); *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).   There must be an affirmative link between the incident at issue and some act by the defendant.   *See Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976).

The importance of specific facts showing personal involvement in a civil-rights violation cannot be emphasized enough in a case involving the defense of qualified immunity.   Fifth Circuit precedent makes clear that courts must "examine each individual's entitlement to qualified immunity separately."   *Ramirez v. Guadarrama*, 3 F.4th 129, 136 n.4 (5th Cir. 2021) (citing *Carroll v. Ellington*, 800 F.3d 154, 174 (5th Cir. 2015);

and *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007) (holding that it was error for the district court to consider the actions of multiple police officers together)).  Luna's claims against the individual defendants are examined separately below based on the allegations that he has made against each one, including his allegations against Nurse Rhonda Williams, who has not been served.

### 1.    Nurse Practitioner Granados

Luna alleges that Nurse Practitioner Granados violated his rights when he returned to the Jail following his arrest on November 12, 2020.  (Dkt. No. 33 at 44–46).  He alleges that Granados refused to provide care for his surgical incision, which then became infected.  (*Id.*).  He appears to claim that Granados should have immediately sent him to a urologist to treat the surgical incision.  (*Id.* at 46).  He also alleges that Granados denied him medical care by refusing to send him back for additional testing that was recommended by the gastroenterologist who examined him in March 2021.  (*Id.* at 52–53).

The medical records, which confirm that Luna was seen at the CMC-ER following his arrest on November 12, 2020, refute Luna's claim that he was denied care for his surgical incision or that the wound became infected.  (Dkt. No. 94-7 at 3–5).  During his evaluation at the CMC-ER a provider noted the small surgical incision on Luna's penis and discharged him in "good" condition.  (*Id.* at 4–5).  Luna received several medications upon his return to the Jail, including an antibiotic cream for the incision on his penis. (Dkt. No. 94-4 at 2).  When Luna complained of pain and requested a wound check on November 13, 2020, Jail medical personnel sent him back to the CMC-ER, where a consulting urologist (Dr. New) authorized a testicular ultrasound.  (Dkt. No. 94-4 at 2);

(Dkt. No. 94-5 at 2); (Dkt. No. 94-7 at 7). Dr. New concluded that Luna's penis was healing properly and that there were no signs of infection. (Dkt. No. 94-5 at 2). Luna complained about his incision again on December 21, 2020, but the wound was observed to be dry and healed. (Dkt. No. 94-4 at 3). When Dr. New saw Luna later on March 18, 2021, he observed no sign of infection. (Dkt. No. 94-5 at 2).

In addition, the medical records show that Luna was evaluated by a gastroenterologist (Dr. Verma) based on a referral from CMC-ER on March 10, 2021, after Luna vomited blood at the Jail. (Dkt. No. 94-7 at 35). Dr. Verma considered Luna's claim that his stomach issues were the result of a piece of metal that he swallowed at the Jail, and concluded that the object had likely passed in his stool. (Dkt. No. 94-6 at 1). Luna did not report any symptoms of abdominal pain during the visit. (*Id*. at 2). After reviewing Luna's medications and lab work, Dr. Verma determined that he was suffering a minor gastrointestinal issue that did not require further testing. (*Id*.).

Luna has not alleged facts or offered evidence showing that his surgical incision became infected because Nurse Practitioner Granados refused to treat him or knowingly treated him incorrectly upon his return to the Jail on November 12, 2020. Luna also fails to allege specific facts showing that he required a follow-up appointment with Dr. Verma, but that Nurse Practitioner Granados refused to schedule one. A party's self-serving and unsupported statements will not defeat summary judgment where the evidence in the record is to the contrary. *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000). Likewise, a plaintiff's conclusory allegations are insufficient to overcome a properly supported qualified immunity defense. *See Williams-Boldware v. Denton County, Tex.*, 741 F.3d 635,

643–44 (5th Cir. 2014)(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).   Because Luna does not demonstrate that Nurse Practitioner Granados denied him care with deliberate indifference, Granados is entitled to qualified immunity from his claims against her.

### 2.      Nurse Rhonda Williams (Nurse Rhonda Ullman)

In his Amended Complaint, Luna alleged that Registered Nurse Rhonda Williams denied him adequate care by a urologist.  (Dkt. No. 14 at 6).  At the *Spears* hearing, Luna identified Nurse Williams as the person who, along with Nurse Granados, was responsible for scheduling appointments for inmates with the Jail and that she denied him medical care for priapism.  (Dkt. No. 33 at 54–56).  In the M&R that was issued after the *Spears* hearing, Judge Libby retained a general claim against Nurse Williams for denying Luna adequate medical care from a urologist.  (Dkt. No. 49 at 24–25).  After the Court authorized service of process, counsel for the defendants filed an advisory, noting that there was no Rhonda Williams employed at the Jail and no registered nurse by that name could be located.  (Dkt. No. 55).  Thus, the Nurse Williams identified by Luna has not been served and has not filed an answer.

In his Response to the Motion for Summary Judgment, Luna alleges for the first time that the claims he asserted in his Amended Complaint against Nurse Williams are really against Nurse Ullman.  (Dkt. No. 98 at 11–12).   In addition to the claim retained by Judge Libby about Luna's confinement at the Jail from November 12, 2020, until June 17, 2021, Luna now appears to claim that Nurse Ullman denied him care by a urologist when

he was at the Jail in 2018 and 2019 and that his penis became permanently damaged, requiring surgery in 2020.  (*Id*. at 12).

Although Nurse Ullman has not been formally served, she has provided an affidavit in support of the Defendants' Motion for Summary Judgment, detailing the care that Luna received for priapism while at the Jail between November 12, 2020, and June 17, 2021, which included care from the CMC-ER and a urologist.  (Dkt. No. 94-4).  The Defendants have provided Nurse Ullman's summary of the medical records in support of their argument that Luna fails to demonstrate a constitutional violation or overcome the defense of qualified immunity.  (Dkt. No. 94 at 11-13).  The Fifth Circuit has recognized that when one defending party establishes that the plaintiff has no cause of action, this defense generally inures also to the benefit of other similarly situated defendants.  *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (allowing unserved defendants to benefit from a favorable summary judgment motion filed by appearing defendants in a civil rights case).  Because the evidence in the summary-judgment record does not support a claim against Nurse Ullman, the Court will consider Luna's claims against her.

At the *Spears* hearing Luna alleged that he suffered persistent priapism erections lasting up to 12 hours during January, February, and March of 2021.  (Dkt. No. 33 at 47).  During his deposition, Luna clarified that he suffered priapism erections on only two occasions while at the Jail during the relevant time period between November 12, 2020, and June 17, 2021.  (Dkt. No. 94-1 at 13–14).  Although Luna believed that those incidents occurred in December 2020 and March 2021, the medical records show that Luna was

treated for prolonged erections on December 31, 2020, and February 18, 2021.  (Dkt. No. 94-4 at 3); (Dkt. No. 94-7 at 19–22, 32–34).  On each occasion Luna was sent to the CMC-ER, where he was treated with an injection.  (Dkt. No. 94-7 at 20–21, 33–34).  Luna acknowledged in his deposition that he received treatment in the emergency room on each occasion that he complained.  (Dkt. No. 94-1 at 13–14).

The medical records also show that Luna was not denied care from a urologist. After reviewing the results of Luna's testicular ultrasound on November 13, 2020, Dr. New prescribed Sudafed to treat his priapism, which is consistent with the medication prescribed for Luna by previous urologists.  (Dkt. No. 94-3 at 2-3); (Dkt. No. 94-4 at 2); (Dkt. No. 94-5 at 2).  Luna acknowledged that he had a prescription for Sudafed, which is what he took to treat his priapism while he was out of custody, for the duration of his stay at the Jail from November 12, 2020, through June 17, 2021.  (Dkt. No. 94-1 at 4, 6–7).

The medical records confirm that Luna was given a referral for a follow-up appointment with a urologist when he was treated for priapism at the CMC-ER on December 31, 2020.  (Dkt. No. 94-7 at 22).  Although Luna did not see Dr. New again until March 18, 2021, Dr. New explains that Luna's appointment was scheduled based on the time the referral was made, his existing appointment bookings, and the severity of the medical need.  (Dkt. No. 94-5 at 1, 2).  The medical records show that Nurse Ullman contacted Dr. New's office for details on February 9, 2021, and was told by Dr. New's staff that Luna would be seen when an appointment was available.  (Dkt. No. 94-7 at 28).

After examining Luna on March 18, 2021, Dr. New concluded that he would need to review medical records about the surgery performed by Dr. Ayoub in Houston before recommending a treatment plan.  (Dkt. No. 94-5 at 2).  Dr. New's opinion, which was not received at the Jail until May 6, 2021, was that Luna may need another shunt surgery.  (Dkt. No. 94-7 at 47).  Because Dr. New was not comfortable performing the procedure, he recommended that the Jail consider referring Luna to a male erectile specialist in Houston.  (*Id.*).  Shortly thereafter, Luna was transferred from the Jail to state prison following his felony conviction on June 3, 2021.

According to her affidavit and the available medical records, Nurse Ullman knew that Luna had a referral to see Dr. New and contacted his office multiple times to check on the status of this appointment.  (Dkt. No. 94-4 at 2); (Dkt. No. 94-7 at 26–27).  She also contacted Dr. New's office to inquire about his treatment recommendation.  (Dkt. No. 94-4 at 3); (Dkt. No. 94-7 at 42).  Luna does not allege specific facts showing that Nurse Ullman knew of, but disregarded a serious medical need by denying him access to a urologist with deliberate indifference or that she was the cause of delay in receiving care from Dr. New.  Instead, the medical records reflect that the delay in receiving a follow-up appointment with a urologist was attributable to Dr. New's scheduling practices and his need to review medical records from the previous treating physician who performed the shunt surgery in October 2020.  (Dkt. No. 94-5 at 1–2).

In his Response to the Motion for Summary Judgment, Luna alleges that he submitted 40 or 50 sick call requests about priapism erections, but that his requests were ignored by Nurse Ullman.  (Dkt. No. 98 at 14).  He does not provide details or specific

dates for those requests.  Likewise, he does not provide or point to any evidentiary support for this claim and his unsworn Response is not competent summary judgment evidence.  *See Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) ("Unsworn pleadings, memoranda or the like are not . . . competent summary judgment evidence."). His bare allegations are insufficient to show that Nurse Ullman was aware of but consciously disregarded any risk of serious harm.  *Torres*, 972 F.3d at 663.  Because Luna does not demonstrate that Nurse Ullman denied him care by a urologist in violation of his constitutional rights, those claims will be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B); *see also* 42 U.S.C. 1997e(c)(1) ("The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.").

The Court notes that Luna has made some allegations that he was denied adequate care at the Jail during one of his previous stays there in 2018 and 2019.  He makes this assertion in his Response to the Motion for Summary Judgment on February 28, 2023. (Dkt. No. 98 at 12).  To the extent that Luna alleges that Nurse Ullman or other medical personnel were responsible for denying him care by a urologist in 2018 and 2019, Luna did not raise such a claim in his Amended Complaint, which only references conditions of his confinement during 2020 and 2021.  (Dkt. No. 14 at 9).  Luna's testimony at the *Spears* hearing was also focused on his claim that he was denied medical care by a

specialist in 2020 and 2021.  (Dkt. No. 33 at 10).  In addition, Luna acknowledged during his deposition that he was only complaining about issues that arose in 2020 and 2021. (Dkt. No. 94-1 at 7).  Although Nurse Ullman has provided an affidavit, she does not address any treatment that was requested by or provided to Luna in 2018 or 2019.  (Dkt. No. 94-4).

Luna has not moved for leave to amend the operative complaint to include a claim that he was also denied medical care from Nurse Ullman and other unidentified medical providers in 2018 and 2019.  This case was originally filed in 2021.  The deadline to amend pleadings expired on December 2, 2021, and discovery has been closed since September 2, 2022.  (Dkt. No. 59); (Dkt. No. 88).  Where the Court ordered deadline for amending pleadings has passed, that schedule "may be modified" to allow for additional amendments "only for good cause and with the judge's consent." Fed. R. Civ. Proc. 16(b)(4); *see S&W Enterprises, L.L.C. v. SouthTrust Bank of Alabama, NA*, 315 F.3d 533, 536 (5th Cir. 2003) ("We take this opportunity to make clear that Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired.").  Luna has not established good cause here.  Nor does he show that leave to amend would be appropriate under the more lenient standard found in Fed. R. Civ. P. 15(a).

Assuming that Luna's newly proposed allegations are within the governing two-year statute of limitations for Section 1983 claims, leave to amend need not be granted where there has been undue delay on the plaintiff's part that would result in prejudice to the defendants, such as the need to reopen discovery.  *See Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (holding that the district court correctly denied the plaintiff's

motion for leave to amend based on his undue delay and the proposed amendment's undue prejudice to the defendants).  Allowing leave to amend at this late date would only further protract this lawsuit and would unfairly prejudice the Defendants, who have asserted qualified immunity from suit.  The Fifth Circuit has recognized that, where qualified immunity is at issue, civil rights plaintiffs need not be "allowed to continue to amend or supplement their pleading until they stumble upon a formula that carries them over the threshold." *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999) (per curiam) (quoting *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)).  Accordingly, the Court declines to consider Luna's allegation that he was denied medical care by Ullman or any other provider at the Jail before his arrest and confinement on November 12, 2020.[5]

### 3.    Dr. Roberts

Judge Libby retained a general claim that Dr. Roberts denied Luna adequate medical care from a urologist while he was in custody at the Jail.  (Dkt. No. 49 at 24–25).  The record shows that Dr. Roberts saw Luna at Crossroads Psychiatry after he requested a mental health interview on May 28, 2021.  (Dkt. No. 94-4 at 4).  There is no record

---

[5]    The undersigned notes that Luna has filed a motion for discovery and a motion for appointment of counsel, one of several in this case, since submitting his Response to the Motion for Summary Judgment.  (Dkt. No. 108); (Dkt. No. 110).  To stay summary judgment the movant must demonstrate to the court "specifically how the requested discovery pertains to the pending motion," *Wichita Falls Office Associates v. Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992), by explaining "how the additional discovery will create a genuine issue of material fact."  *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993).  Luna has not made this showing.  To the extent that Luna has requested counsel for the purpose of further amending his pleadings to add Nurse Ullman as a defendant (Dkt. No. 110), the Court has considered his claims against her. Because his lack of formal legal training does not, standing alone, constitute an exceptional circumstance, Luna has not otherwise shown that appointment of counsel is necessary.  *See Thompson v. Texas Dep't of Criminal Justice*, 67 F.4th 275, 283 (5th Cir. 2023).

showing that Dr. Roberts had any role in providing care for issues other than Luna's mental health.  Because Luna does not show that she had any involvement in treating his priapism, he does not demonstrate that she denied him care by a urologist with deliberate indifference.  Accordingly, Dr. Roberts is entitled to summary judgment on Luna's claims against her.

### 4.   Nurse Brumbelow

Judge Libby also retained a general claim that "Nurse Gayle," who was identified as Nurse Brumbelow, denied Luna adequate medical care from a urologist while he was at the Jail.  (Dkt. No. 49 at 24–25).  Luna does not provide any details in support of his allegation against Nurse Brumbelow, and he does not reference any specific instance in which she denied him care.  The medical records show that Nurse Brumbelow saw Luna after he submitted a sick call request at the Jail on November 15, 2020, complaining of pain in his genital area and penis.  (Dkt. No. 94-7 at 9).  Nurse Brumbelow contacted Dr. McNeill, who referred Luna to the emergency room at Citizens Medical Center that same day.  (*Id.*); (Dkt. No. 94-3 at 2).  According to Dr. McNeill, Luna's penis was observed to be clean and dry with no sign of infection.  (Dkt. No. 94-3 at 2).  Although Luna did not see a urologist that day, he does not allege facts showing that one was needed on that occasion.

The record shows that Nurse Brumbelow did not deny Luna medical care on November 15, 2020, and he does not offer any other facts showing that she refused to treat him or knowingly treated him incorrectly on another specific occasion.  His conclusory allegations are insufficient to overcome Nurse Brumbelow's claim of qualified

immunity. *See Williams–Boldware*, 741 F.3d at 643–44.  Accordingly, Nurse Brumbelow is entitled to summary judgment on Luna's claims against her.

### 5.    Nurses Lawson, DeLeon, and Black

Luna made general allegations that Nurses Lawson, DeLeon, and Black denied him medical care from a urologist, and Judge Libby retained those claims.  (Dkt. No. 49 at 24–25).  Luna does not offer any details in support of his claims against these nurses, and he does not describe any specific incident in which his request for care was denied or ignored by one of them.  He does not point to any evidence and the record reflects that Luna received care when he reported having a prolonged erection, including a referral to a urologist.  As with Nurse Brumbelow, Luna's unsupported allegations are insufficient to overcome the qualified immunity defense. *See Williams–Boldware*, 741 F.3d at 643–44. Therefore, Nurses Lawson, DeLeon, and Black are entitled to summary judgment on Luna's claims against them.

### 6.    Nurse Machac

Luna alleged that Nurse Machac denied him adequate care by a dentist after he reported having a broken tooth on December 18, 2020, as the result of biting a metal bread tie.  (Dkt. No. 33 at 14–15).  The Court notes that Judge Libby retained similar claims for the denial of care by a dentist against Nurse Williams (Ullman) and Nurse Gayle (Brumbelow).  (Dkt. No. 49 at 26–27).  The record does not support Luna's claim that he was denied care by a dentist with deliberate indifference by these Defendants.

Luna acknowledged during the *Spears* hearing that Nurse Machac placed him on the dentist list, and that she also recommended x-rays after he told her that he swallowed

a piece of metal.  (Dkt. No. 33 at 15).  The medical records confirm that Nurse Machac gave Luna pain medication and placed him on the waiting list to see a dentist immediately after he reported breaking a tooth on December 18, 2020.  (Dkt. No. 94-4 at 3); (Dkt. No. 94-7 at 13).  Nursing staff observed no redness or swelling around the affected tooth.  (Dkt. No. 94-3 at 3).  Within days of the incident, Luna had x-rays taken of his abdominal cavity at the Jail and at the CMC-ER, which disclosed a foreign object that looked like a thin piece of wire.  (Dkt. No. 94-7 at 14, 15, 17).  Luna saw a gastroenterologist on March 10, 2021, but Dr. Verma concluded that his minor gastrointestinal issues were not caused by the foreign object that he swallowed.  (Dkt. No. 94-6 at 1).

Luna submitted a sick call asking about his place on the waiting list for a dentist on April 26, 2021, and Nurse Machac advised him that he was still on the list.  (Dkt. No. 94-7 at 43).  Although Luna was not seen by a dentist until May 8, 2021, Nurse Ullman notes that this was the average wait time for inmates to see a dentist.  (Dkt. No. 94-4 at 4).  She notes further that other than the sick call request he submitted on April 26, 2021, Luna had not complained of tooth or gum pain since December 24, 2020.  (*Id.*).

Luna does not dispute that Nurse Machac promptly placed him on the dental list in December 2020, shortly after he reported biting into a metal bread tie.  (Dkt. No. 94-7 at 13).  The available medical records reflect that Luna did not complain about his tooth again until April 26, 2021 (Dkt. 94-7 at 43), and there is no evidence showing that he required dental care on an expedited basis before that time.  Luna has not offered facts showing that Nurse Machac, Nurse Ullman, or Nurse Brumbelow knew that he was in

pain or that he needed dental care sooner than it was provided, but deliberately ignored a serious medical need.  Under these circumstances, Luna does not establish that Nurse Machac, Nurse Ullman, or Nurse Brumbelow denied him dental care with deliberate indifference.  Accordingly, Nurse Machac, Nurse Ullman, and Nurse Brumbelow are entitled to qualified immunity and summary judgment on these claims.

### B.    CLAIMS AGAINST VICTORIA COUNTY

Luna contends that Victoria County is liable for the violation of his constitutional rights because it has a policy of not allowing pretrial detainees to see specialists as a way to avoid costs.  (Dkt. No. 33 at 59).  A municipality or local government entity cannot be held vicariously liable under a theory of respondeat superior for the wrongdoing of municipal employees.  *See Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).  Liability against a government entity is available under Section 1983 only for acts that are "directly attributable to it 'through some official action or imprimatur.'"  *James v. Harris Cnty., Tex.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).  To prevail, a plaintiff must prove that "(1) an official policy (2) promulgated by the municipal policymaker (3) . . . was the moving force behind the violation of a constitutional right."  *Edwards v. City of Balch Springs, Texas*, 70 F.4th 302, 307–08 (5th Cir. 2023).  The Defendants provided evidence that Jail inmates can be referred to a specialist by Dr. McNeill, who may send inmates to the CMC-ER, or they may be referred to a specialist by another treating physician.  (Dkt. No. 94-3 at 1); (Dkt. No. 94-4 at 1).  The Defendants note that Luna received referrals for care by physicians at the CMC-ER on numerous occasions,

and that he also received care by specialists, including a urologist, a gastroenterologist, and a dentist. (Dkt. No. 94 at 22–23). The Defendants contend, therefore, that there is no policy at the Jail to deny inmates treatment or prevent them from seeing a specialist and that Luna was not denied care in violation of his constitutional rights. (*Id.*).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (citations omitted). Isolated acts cannot establish the existence of a custom or practice. *Guillot v. Russell*, 59 F.4th 743, 753 (5th Cir. 2023). To demonstrate that a custom or policy exists, a plaintiff must show either "a pattern of unconstitutional conduct . . . on the part of municipal actors or employees," or that "a *final policymaker* took a single unconstitutional action." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) (emphasis in original).

The medical records reflect that Luna was sent to the CMC-ER on numerous occasions for complaints related to priapism, genital pain, and other issues. (Dkt. No. 94-7 at 1–10, 15–17, 19–21, 29–34). The Defendants have presented evidence showing Luna received a referral for a urologist on December 31, 2020, and that medical personnel contacted Dr. New for a urology appointment, but that the appointment was delayed until March 18, 2021, as the result of his scheduling procedures. (Dkt. No. 94-5 at 1–2); (Dkt. No. 94-7 at 22, 26–28). Likewise, records show that Luna was immediately added to the waiting list to be seen by a dentist on December 18, 2020, but that he was not seen until five months later because his circumstances were not an emergency. (Dkt. No. 94-4

at 3–4); (Dkt. No. 94-7 at 13).  Although there was some delay in being seen, Luna has not identified a policy adopted by an official policymaker on behalf of Victoria County to deny Jail inmates care by a specialist.  Nor does he demonstrate that his constitutional rights were violated by the Jail employees as the result of such policy or by a widespread, persistent pattern of serious deficiencies in providing care.  *See Estate of Henson v. Wichita County, Tex.*, 795 F.3d 456, 469–70 (5th Cir. 2015).  Under these circumstances, Luna fails to demonstrate municipal liability, and Victoria County is entitled to summary judgment.

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Motion for Summary Judgment filed by Victoria County, Veronica Granados, Katrina Lawson, Robin Deleon, Gayle Brumbelow, Madison Machac, Kourtne Roberts, and Ashley Black (Dkt. No. 94). The claims against Rhonda Ullman are **DISMISSED** under 28 U.S.C. § 1915(e)(2)(B) and 42 U.S.C. § 1997e(c)(1).

It is SO ORDERED.

Signed on September 24, 2023.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**